# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WORLD ENERGY, LLC, WORLD ENERGY LOS ANGELES, LLC, ALTAIR PARAMOUNT, LLC, and PARAMOUNT PIPELINE, LLC,

Plaintiffs,

v.

AIR PRODUCTS AND CHEMICALS, INC., and AIR PRODUCTS MANUFACTURING LLC,

Defendants.

C.A. No. 2025-0912-MTZ

## MEMORANDUM OPINION

Date Submitted: January 16, 2026
Date Decided: July 6, 2026

Lauren Dunkle Fortunato, Jason W. Rigby, Alyssa T. Atkisson McKeever, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Matthew G. Mrkonic, Tucker R. Hunter, HONIGMAN LLP, Detroit, Michigan, *Attorneys for Plaintiffs*.

John L. Reed, Michael A. Carbonara, Jr., DLA PIPER LLP (US), Wilmington, Delaware; Steven M. Rosato, DLA PIPER LLP (US), New York, New York, *Attorneys for Defendants*.

**ZURN, Vice Chancellor.**

Two major players in the alternative fuel industry teamed up to convert a gas refinery to make renewable jet fuel. As in many ventures, one side was to do the work, and the other side was to help pay for it. The payor did not pay, so the worker did not work. The payor came to this Court seeking a mandatory injunction requiring the worker to make repairs to the refinery. I denied the requested relief from the bench, and promised a written explanation.[1] This opinion provides that explanation, and grants the defendants' motion to dismiss.

## I.    BACKGROUND[2]

Plaintiffs World Energy, LLC ("WE LLC"), World Energy Los Angeles, LLC ("WELA"), AltAir Paramount, LLC ("AltAir"), and Paramount Pipeline, LLC ("Paramount Pipeline," and together with WE LLC, WELA, and Alt Air, "World Energy") operate biodiesel manufacturing plants throughout the United States.[3] World Energy is a pioneer in the production of sustainable aviation fuel.[4] AltAir owns and operates the Paramount, California-based fuel refinery at the center of this

---

[1] D.I. 36; D.I. 37.

[2] I draw the following facts from the Verified Complaint, and the documents attached to or integral to it. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004). Citations in the form "Carbonara Aff." refer to the affidavit of Michael A. Carbonara, Jr., available at D.I. 24. Citations in the form of "Hr'g Tr. —" refer to the transcript for the oral argument on the motions, available at D.I. 38.

[3] D.I. 1 [hereinafter "Compl."] ¶ 46.

[4] *Id.* ¶ 62.

action (the "Paramount Facility").[5]  In March 2018, World Energy acquired AltAir and the Paramount Facility with the aim of converting it from a petroleum refinery into "one of the most innovative and largest [sustainable] fuel refineries in the world."[6]

World Energy needed a hydrogen supplier for the Paramount Facility.[7]  In 2019, it entered into a supply agreement with defendant Air Products and Chemicals, Inc. ("APC," and together with defendant Air Products Manufacturing LLC "Air Products"), a global industrial gases supplier and leader in energy transition.[8]

World Energy and Air Products saw additional opportunity to develop the Paramount Facility together.[9]  In March 2020, AltAir and Air Products entered into an agreement by which Air Products would "optimize existing Paramount Facility operations" on what would be called "Plant A," and "design, engineer, and construct certain expansions" on what would be called "Plant B."[10]  The project got off to a rough start, with delays and cost overruns continuing well into 2023.[11]  World

---

[5] *Id.* ¶¶ 48–52.

[6] *Id.*

[7] *Id.* ¶¶ 55–57.

[8] *Id.* ¶¶ 47, 58–61, Ex. 10.

[9] Compl. ¶¶ 62–66.

[10] *Id.* ¶¶ 69, 70, Ex. 3.

[11] Compl. ¶¶ 79–92.

Energy alleges Air Products had overstated its expertise, and blames Air Products for those issues.[12]

Yet World Energy opted to entrust Air Products with more responsibility. In early 2023, the parties began exploring a path for World Energy to sell the Plant A assets and "hand over daily operations" at the Paramount Facility to Air Products.[13] On November 14, the parties executed a suite of agreements to that effect.[14] The Master Project Agreement and the Credit Agreement are central to this action.

**A. The Master Project Agreement And Credit Agreement**

The Master Project Agreement amended and restated the 2020 agreement in its entirety.[15] Air Products would perform optimization and expansion work on Plant A and Plant B.[16] Air Products was also required to "use commercially reasonable efforts to cooperate with World Energy, as reasonably requested by World Energy," to "assist World Energy to secure working capital finance."[17]

World Energy would help pay for Air Products' work through two monthly payments: (1) a monthly operating fee (the "MOF"), consisting of Air Products'

---

[12] *Id.*

[13] *Id.* ¶¶ 93–94.

[14] *Id.* ¶¶ 94–98.

[15] Compl. Ex. 1 [hereinafter "Master Project Agreement"] at 1.

[16] *Id.* §§ 2.1–2.2.

[17] *Id.* § 32.15.

4

"actual out-of-pocket costs and expenses"; and (2) a monthly fixed fee (the "MFF"), representing a fixed "rate of return of 4.5% on the asset acquisition cost and other capitalized costs."[18] Both payment obligations began accruing as soon as Air Products began its work on Plant A.[19] Both payments were due within thirty days of receiving an invoice at the beginning of each month.[20] World Energy was entitled to dispute invoiced amounts in good faith within one year of the invoice date, but had to pay any undisputed amount within thirty days of the invoice.[21] While World Energy could "dispute proposed adjustments and calculations," it could not "otherwise challenge the obligation to pay the MFF."[22] In the event of a dispute, World Energy was required to "set forth the basis for its dispute" and provide "supporting documentation with respect to the amount disputed."[23]

The monthly payments were material to the Master Project Agreement. Section 8.2(B) expressly conditioned Air Products' performance on timely payments of all undisputed MOF and MFF invoice amounts.[24] If World Energy failed to pay

---

[18] Compl. ¶ 103; Master Project Agreement §§ 8.1, 9.2, 9.3, 9.5, Attachment B, Attachment K.

[19] Master Project Agreement §§ 9.3, 9.5.

[20] *Id.* § 8.1.

[21] *Id.* § 8.2(A).

[22] *Id.*

[23] *Id.*

[24] *Id.* § 8.2(B).

those undisputed amounts within fifteen days of their due date, Air Products was entitled to suspend performance upon providing forty-five days' written notice.[25] And if World Energy failed to remedy a missed MFF payment within ninety days of receiving that written notice, it would be deemed in "Material Breach."[26]

Under Section 18.1(B), "[i]f a non-breaching Party believes that the other Party is in Material Breach," it must "promptly notify the other Party in writing, and in reasonable detail, of the substance of, and basis for, its belief that a Material Breach . . . has occurred."[27] If a Material Breach remained unremedied throughout the applicable notice and cure period, the non-breaching party could then "immediately terminate" the Master Project Agreement upon providing a termination notice.[28] Under Section 18.2, the parties must also provide written notice of, and an opportunity to cure, any "Ordinary Breach."[29]

Under the Credit Agreement, Air Products also agreed to loan World Energy up to $270 million.[30] The principal amount was split up into two tranches: $180

---

[25] *Id.*

[26] *Id.* §§ 18.1(A)–(i).

[27] *Id.* § 18.1(B).

[28] *Id.*

[29] *Id.* § 18.2.

[30] *See* Compl. Ex. 6 [hereinafter "Credit Agreement"].

million upon closing of the Credit Agreement and $90 million in January 2024.[31] World Energy received the loan in full.[32]

The interest rate on the loan "[p]rior to the Plant B Commencement Date" was set at 15%.[33] Interest payments were due on the last day of each calendar month.[34] Nonpayment, coupled with a failure to remedy the default within three business days, constituted an "Event of Default."[35] Per Section 8, upon an Event of Default, Air Products was entitled to terminate its commitments and "declare the Loans then outstanding to be due and payable in whole," with the aggregate principal, accrued interest, and other fees "automatically [] due and payable, without presentment, demand, protest or other notice of any kind."[36]

---

[31] *Id.* §§ 2.1(a)–(b).

[32] *See* Carbonara Aff. Ex. B [hereinafter "Forbearance Agreement"] § 1.02(b) ("As of July 2, 2024, (i) the aggregate principal amount of Loans outstanding under the Credit Agreement was not less than $270,000,000 (which amount does not include fees, expenses, interest, or other amounts chargeable or otherwise reimbursable under the Loan Documents) . . . .").

[33] Credit Agreement §§ 1.1, 2.10(a).

[34] *Id.* §§ 1.1, 2.10(c).

[35] *Id.* § 8(b).

[36] *Id.* § 8.

### B. World Energy Defaults; The Parties Execute a Forbearance Agreement.

World Energy defaulted immediately and repeatedly. The parties memorialized that reality in a Forbearance Agreement dated July 10, 2024.[37] World Energy "acknowledge[d] and agree[d]" that it had breached its payment obligations under both the Master Project Agreement and the Credit Agreement since November 2023, and that it would likely remain in default through September 2024.[38] As of July 2024, World Energy's missed payments totaled nearly $19 million.[39] World Energy also acknowledged that Air Products had "fully and timely performed all of [its] obligations and duties under the Agreements . . . and ha[d] acted reasonably and in good faith under the circumstances."[40]

"In reliance upon" those acknowledgements, Air Products agreed to "forbear from exercising any rights or remedies that it may have against [World Energy] or [its] respective assets and properties, in each case solely as a result of the occurrence of the Specified Defaults," until September 30, 2024.[41]

---

[37] *See* Forbearance Agreement.

[38] *Id.* §§ 1.01(b)–(c).

[39] *Id.* §§ 1.02(b), (d).

[40] *Id.* § 1.03.

[41] *Id.* §§ 2.01, 2.03(g).

**C. Activist Investors Target Air Products, And The Parties Execute The Second Amendment To The Credit Agreement.**

In mid-2024, Air Products became the target of activist investor campaigns.[42] One campaign assailed the World Energy project as "Exhibit A" of Air Products' mismanagement.[43] Air Products focused on monetizing that project.[44] It pushed for an amendment to the Credit Agreement that would change certain provisions governing the disposition and distribution of assets.[45] According to the Complaint, Air Products threatened to "stop working with World Energy to obtain working capital financing,"[46] and promised to provide another forbearance agreement if World Energy executed the Second Amendment.[47]

The parties executed the Second Amendment to the Credit Agreement on September 30, 2024.[48] It recites that "the Borrower [i.e., AltAir] has requested that [Air Products] amend certain provisions of the Credit Agreement."[49] The parties did not enter into another forbearance agreement.[50]

---

[42] Compl. ¶ 144; *see also id.* Ex. 9.

[43] Compl. ¶ 165.

[44] *Id.* ¶ 146.

[45] *Id.* ¶¶ 147–50; Carbonara Aff. Ex. C.

[46] Compl. ¶¶ 151–53.

[47] *Id.* ¶ 156.

[48] *Id.* ¶ 154; Carbonara Aff. Ex. C.

[49] Carbonara Aff. Ex. C at 1.

[50] Compl. ¶ 156.

### D. World Energy Continues To Default; Air Products Exercises Its Remedies.

World Energy remained in default after the forbearance period. Between October 2024 and February 2025, Air Products sent World Energy nine default notices pursuant to the Master Project Agreement, and six default notices pursuant to the Credit Agreement.[51] The Master Project Agreement notices explained that World Energy had not provided any grounds to dispute the invoiced amounts, that Air Products was entitled to suspend performance after forty-five days, and that Air Products was entitled to terminate the Master Project Agreement after ninety.[52] The Credit Agreement notices explained that Air Products "expressly reserve[d] the right" to exercise any and all remedies available under the Credit Agreement "at any time."[53]

In late January 2025, a new slate of directors was elected to Air Products' board.[54] The new leadership commanded a shift away from energy transition projects.[55] In early February, Air Products told World Energy it was not going forward with the Plant A optimization work.[56] On February 24, Air Products

---

[51] *See* Carbonara Aff. Exs. G–U.

[52] Carbonara Aff. Exs. G–O.

[53] Carbonara Aff. Exs. P–U.

[54] Compl. ¶ 163.

[55] *Id.* ¶¶ 163–69.

[56] *Id.* ¶¶ 170–72.

publicly announced the termination of three energy transition projects, including the World Energy project.[57]  The same day, Air Products sent World Energy written notice that it was terminating the Master Project Agreement, effective immediately.[58] The termination notice explained that World Energy's MFF defaults constituted "a Material Breach under Section 18.1(A)(i)," and entitled Air Products to terminate the Master Project Agreement under Section 18.1(B)(i).[59]

Later that week, the parties elected to move forward with a planned "February 2025 turnaround" so that Air Products could "hand back the keys" to World Energy.[60] World Energy claims Air Products promised as part of that turnaround work to repair the "12-D Rack," a "support rack that holds up utility lines" necessary for Plant A's operations.[61]  Air Products and its subcontractor "completed the necessary pre-work for the 12-D Rack repair," including the removal of external bracing and scaffolding.[62]  But Air Products did not complete the repair.[63]  The 12-

---

[57] *Id.*  ¶ 167.

[58] *Id.*  ¶ 173; *see* Carbonara Aff. Ex. V.

[59] Carbonara Aff. Ex. V at 1.

[60] Compl. ¶ 176–77.

[61] *Id.* ¶¶ 178, 179.

[62] *Id.* ¶ 186.

[63] *Id.* ¶ 187.

D Rack sits unusable, rendering the Paramount Facility's only "continuously-active" environmental remediation system inoperable.[64]

On March 26, over a month after Air Products' termination notice, World Energy sent two letters challenging the termination.[65] The first claimed the "sole purported ground" for termination—the MFF payments—was invalid because the payments were "the subject of a good faith dispute by World Energy and therefore [we]re not due."[66] It also claimed Air Products, not World Energy, "Materially Breached the [Master Project Agreement] and, through its own wrongful conduct, prevented World Energy from being able to pay the [MFF]."[67] The letter demanded that "Air Products immediately withdraw its repudiation and improper termination of the [Master Project Agreement] and confirm in writing that it will comply with all of its contractual obligations."[68]

World Energy also sent Air Products a formal notice of breach of the Master Project Agreement.[69] The notice advised of: (1) a material breach of Section 2.1(D) by failing to complete and fund, and then by repudiating, the Paramount Facility

---

[64] *Id.* ¶¶ 190–91.

[65] Compl. ¶ 193, Ex. 12; Carbonara Aff. Ex. X.

[66] Carbonara Aff. Ex. X at 2.

[67] *Id.*

[68] *Id.* at 3–4.

[69] *See* Compl. Ex. 12.

expansion project; (2) an ordinary breach of Sections 2.2, 2.3, 4.1, and 16.1 by failing to comply with "specific obligations related to the [w]ork"; and (3) an ordinary breach of Section 32.15 by failing to assist World Energy in securing working capital, as reasonably requested.[70] The notice repeated World Energy's demand that Air Products immediately withdraw termination and perform.[71]

Air Products responded on March 31.[72] It raised World Energy's failure to meet its financial commitments, properly dispute the MFF invoiced amounts, or provide notice of any breach prior to termination.[73] It maintained the termination was valid because "[f]or some time, Air Products has been the only party performing under the [Master Project] Agreement."[74] That same day, Air Products also sent written notice that it was accelerating all amounts due under the Credit Agreement.[75] Air Products demanded immediate payment of $313,568,095.01.[76] World Energy refused to pay.[77]

---

[70] *Id.*

[71] *Id.* at 4.

[72] *See* Carbonara Aff. Ex. Y.

[73] *Id.*

[74] *Id.* at 4.

[75] *See* Carbonara Aff. Ex. Z.

[76] *Id.* at 2.

[77] Compl. ¶ 175.

### E.    Air Products Files Suit In New York.

On April 29, Air Products filed a motion for summary judgment in lieu of complaint against World Energy in New York state court.[78]  The motion sought a $312 million judgment under a guaranty agreement (the "Guaranty"), in which WE LLC irrevocably and unconditionally guaranteed all payments owed by AltAir under the Credit Agreement.[79]  Both the Credit Agreement and the Guaranty contain New York forum selection and choice of law provisions.[80]

On September 19, 2025, the New York court granted the motion in its entirety.[81]  Relevant here, the court rejected World Energy's argument that "the applicable interest rate was 4.5%, not 15%" under the Credit Agreement.[82]  Specifically, it concluded "the Credit Agreement unambiguously sets the 'Applicable Rate' at 15% and permits modifications only through a signed writing."[83]

---

[78] *Id.* ¶ 203.

[79] *Id.* ¶ 204; *see* Carbonara Aff. Ex. A [hereinafter "Guaranty"] § 1.

[80] Credit Agreement § 10.9; Guaranty § 13.9.

[81] *See Air Prods. & Chems., Inc. v. World Energy, LLC*, 2025 WL 2682969, at *4 (N.Y. Sup. Ct. Sept. 19, 2025).

[82] *Id.* at *3.

[83] *Id.*

World Energy appealed. On April 9, 2026, the Appellate Division affirmed the judgment below.[84] On May 11, World Energy moved for leave to further appeal the judgment to the Court of Appeals of the State of New York.[85]

### F. This Litigation

On August 8, 2025, World Energy filed a Verified Complaint (the "Complaint"), along with a motion for preliminary injunction.[86] Counts I and II are breach of contract claims seeking specific performance of the Master Project Agreement. Both counts also seek preliminary and permanent injunctive relief requiring Air Products to "restore and maintain the *status quo* operations of the Paramount facility," with a focus on restoring the 12-D Rack to operation.[87]

Count III alleges a breach of the implied covenant of good faith and fair dealing. Count IV alleges mutual mistake and seeks reformation of the Credit Agreement, particularly its 15% interest rate before the Plant B Commencement Date. Count V alleges Air Products fraudulently induced World Energy into executing the Second Amendment. Count VI seeks a declaration that World Energy has not breached any of its agreements with Air Products, that Air Products' default

---

[84] D.I. 40; D.I. 41; *see Air Prods. & Chems., Inc. v. World Energy, LLC*, 256 N.Y.S.3d 17 (N.Y. App. Div. 2026).

[85] D.I. 41.

[86] D.I. 1.

[87] Compl. ¶¶ 226, 235.

and termination notices are invalid, and that Air Products is not entitled to relief for World Energy's breaches. Count VII asserts a claim for promissory and equitable estoppel.

Air Products moved to dismiss the Complaint on September 2, 2025.[88] The parties briefed the motion for preliminary injunction and motion to dismiss by November 18.[89] I heard oral argument on January 16, 2026.[90] I denied the motion for preliminary injunction from the bench, with a promise to provide a subsequent explanation, and took the motion to dismiss under advisement the same day.[91]

## II. ANALYSIS

World Energy seeks relief for breach of contract, including a mandatory injunction requiring Air Products to fix the 12-D Rack and perform other work at the Paramount Facility.[92] To obtain that extraordinary and final relief, World Energy must state a claim for breach of contract, then prevail on its merits as a matter of law on undisputed facts.[93] World Energy has done neither. Air Products properly

---

[88] D.I. 16.

[89] D.I. 17; D.I. 19; D.I. 24; D.I. 27; D.I. 29.

[90] D.I. 37; *see* Hr'g Tr.

[91] D.I. 36; D.I. 37.

[92] *See* Compl. at Prayer for Relief.

[93] *See Alpha Nat. Res., Inc. v. Cliff's Nat. Res., Inc.*, 2008 WL 4951060, at *2 (Del. Ch. Nov. 6, 2008) ("[Granting a mandatory injunction] requires, in addition, a showing that the petitioner is entitled as a matter of law to the relief it seeks based on undisputed facts."); *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.*, 107 A.3d 1049, 1053–54 (Del. Ch.

16

terminated the Master Project Agreement after World Energy repeatedly breached it. World Energy's breaches were unjustified and unexcused. World Energy has not pled a claim for breach of contract that can support mandatory injunctive relief.

## A. Merits

The pleading standards under Delaware law are "minimal."[94] On a motion to dismiss under Rule 12(b)(6), the Court must "accept all well-pleaded factual allegations in the complaint as true, accept even vague allegations in the complaint as well-pleaded if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[95] The Court will grant a Rule 12(b)(6) motion if the "plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[96] The Court need not "accept as true conclusory allegations without specific supporting factual allegations."[97] The Court

---

2014) ("To issue a mandatory injunction requiring a party to take affirmative action . . . the Court of Chancery must either hold a trial and make findings of fact, or base an injunction solely on undisputed facts.").

[94] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[95] *Id.*

[96] *Id.*

[97] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (internal quotation marks and citations omitted).

is not "required to accept every strained interpretation of the allegations proposed by the plaintiff."[98]

### 1. Breach of Contract

The elements of a claim for breach of contract are familiar: "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[99]  No path to recovery is available unless the plaintiff "demonstrate[s] that it substantially complied with all of the provisions of the contract."[100]

World Energy did not substantially comply with its obligations under the Master Project Agreement.  World Energy's primary obligation was to pay the MOF

---

[98] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[99] *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[100] *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *10 (Del. Ch. July 24, 2013) (citing *Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, at *19 (Del. Super. Aug. 31, 2006)), *aff'd sub nom. Preferred Inv. Servs., Inc. v. T & H Bail Bond, Inc.*, 108 A.3d 1225 (Del. 2015); *see AQSR India Private, Ltd. v. Bureau Veritas Hldgs., Inc.*, 2009 WL 1707910, at *7 (Del. Ch. June 16, 2009) ("It is a basic principle of contract law, however, that to be entitled to specific performance, which is an equitable remedy that rests in the discretion of the court, the party seeking specific performance must have substantially performed under the contract herself." (citations omitted)); *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2021 WL 2588905, at *12 (Del. Ch. June 14, 2021) ("To recover for damages, the plaintiff must demonstrate that he substantially complied with all provisions of the contract." (citing *Shah v. Am. Sols., Inc.*, 2012 WL 1413593, at *2 (Del. Super. Mar. 8, 2012))).

and MFF.[101]  World Energy repeatedly failed to do so.  By its own "free[] and voluntar[y]" acknowledgement in the Forbearance Agreement, World Energy breached the Master Project Agreement by "fail[ing] to pay in full the MFF payments due April 10, 2024, May 1, 2024, May 31, 2024, and July 1, 2024."[102] And in that same agreement, World Energy warned of anticipated future breaches.[103] That warning came true; the record shows World Energy continued to breach its payment obligations every month between October 2024 and February 2025.[104] World Energy does not plead, and the record does not suggest, that it cured those breaches at any point.

World Energy responds by invoking the prevention doctrine, arguing its nonperformance is excused because Air Products engaged in conduct that prevented it from making timely payments:  specifically, that Air Products did not do the work necessary to make the Paramount Facility profitable.[105]  It is well settled that "the failure of a plaintiff to have performed his own obligation will be excused if he was

---

[101] Master Project Agreement §§ 8.1, 9.2, 9.3, 9.5.

[102] Forbearance Agreement §§ 1.01(b)(ii), 3.01.

[103] *Id.* § 1.01(c)(i).

[104] Carbonara Aff. Exs. G–O.

[105] *See* D.I. 27 at 11–12 ("[I]f Air Products had fulfilled its obligations to optimize and operate the facility's production operations, it is undisputed that those operations would have generated millions of dollars of free cash flow . . . .").

prevented by the other party from performing his obligation."[106]  "[T]he doctrine is based on the long-established principle of law that a party should not be able to take advantage of its own wrongful act."[107]  For the doctrine to apply, World Energy must show that Air Products' conduct "contributed materially" to World Energy's defaults.[108]  But if the defaults would have occurred "regardless of the lack of cooperation, the failure of performance did not contribute materially . . . and the rule does not apply."[109]

For defaults before September 30, 2024, the Forbearance Agreement is fatal to World Energy's argument.[110]  There, World Energy acknowledged that Air

---

[106] *Wells v. Lee Builders, Inc.*, 99 A.2d 620, 621 (Del. 1953) (citations omitted); *see also WaveDivision Hldgs., LLC v. Millennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, at *14 (Del. Ch. Sept. 17, 2010) ("It is an established principle of contract law that '[w]here a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.'" (quoting Restatement (Second) of Contracts § 245 (1981))); *Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) ("[A] party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent.").

[107] 13 Richard A. Lord, *Williston on Contracts* § 39:6 (4th ed. 2024).

[108] *See Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30, 2021).

[109] *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *90 (Del. Ch. Aug. 31, 2020) (internal quotation marks omitted) (quoting Restatement (Second) of Contracts § 245 cmt. b (1981)).

[110] The Forbearance Agreement is governed by New York law.  *See* Forbearance Agreement § 6.03.  World Energy asserts that under New York law, the Forbearance Agreement's "admission of liability" does not bar its claims or defenses. D.I. 34; *see Berkshire Bank v. Fawer*, 130 N.Y.S.3d 666, 666 (N.Y. App. Div. 2020).  That does not mean the fact of the Forbearance Agreement and its contractual acknowledgements are

Products "fully and timely performed all of [its] obligations and duties under the Agreements . . . and ha[d] acted reasonably and in good faith under the circumstances."[111] That unambiguous language forecloses the conclusion that Air Products interfered wrongfully or in bad faith with World Energy's ability to pay.

*Wells v. Lee Builders, Inc.* is instructive.[112] There, a buyer sought specific performance of a land sale contract, even though he was required to move a house off the parcel before closing and had not done so.[113] The buyer argued his nonperformance should be excused because the sellers had prevented the buyer from moving the house.[114] The Delaware Supreme Court concluded any prevention of the buyer's performance by the seller "was made immaterial by" an intervening agreement.[115] The agreement contained a "recital of fact" that "certain unforeseen difficulties have caused unavoidable delays in the fulfillment by both the sellers and the buyer of their respective obligations."[116] Its effect "was to wipe out . . . any action on [the sellers'] part which tended to prevent performance by the plaintiff of

---

irrelevant to this Court's analysis of a claim for breach of a contract governed by Delaware law.

[111] Forbearance Agreement § 1.03.

[112] 99 A.2d 620, 621–25 (Del. 1953).

[113] *Id.* at 621.

[114] *Id.*

[115] *Id.* at 622.

[116] *Id.*

its obligation."[117]  Here, as in *Wells*, the Forbearance Agreement "wipe[s] out" any alleged breach or bad faith conduct by Air Products that would excuse World Energy's nonperformance.[118]  And World Energy is "precluded" by its own factual recitals "from contending to the contrary."[119]

That leaves Air Products' conduct after September 30, 2024, until Air Products terminated the Master Project Agreement.[120]  World Energy's primary argument is that Air Products "starve[d] World Energy of revenue that [it] needed" to make its monthly payments, and then, having breached the contract itself, improperly repudiated its obligations.[121]

First, it contends Air Products breached by failing to complete the "2024 Plant A Expansion Shutdown"—which is how the Master Project Agreement labels the overall Plant A expansion work—by the end of 2024.[122]  But nothing in the contract mandates that deadline.  World Energy relies entirely on the "2024" in the defined term to infer a December 31, 2024 deadline.  But the Master Project Agreement explicitly states "that Air Products is not providing any schedule guarantee for the

---

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *See* D.I. 34 at 3 (arguing "World Energy's requested relief is entirely supported by Air Products' post-[forbearance] conduct").

[121] D.I. 27 at 11.

[122] *Id.* at 8–9.

completion of the Work or any component thereof in th[e] Agreement or otherwise."[123]  That specific language controls.[124]

More fundamentally, World Energy's payment obligations were not tied to the fruits of Air Products' work.[125]  The obligations arose as soon as World Energy began working on Plant A, without regard to any operational milestones.[126]  If the

---

[123] Master Project Agreement § 2.2(B).  The 2024 Plant A Expansion Shutdown is a component of Air Products' "Work."  The Master Project Agreement defines "Work" to include the "Construction . . . of the Plant A Expansion Assets."  *Id.* § 1.1.  The term "Construction" is defined to "includ[e] the completion of the 2024 Plant A Expansion Shutdown."  *Id.*; *see also* Compl. ¶ 101.

[124] *See DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." (citations omitted)).

[125] *See, e.g.*, *Desktop Metal, Inc. v. Nano Dimension Ltd.*, 2025 WL 904521, at *37 (Del. Ch. Mar. 24, 2025) (finding the prevention doctrine applicable where a party to a merger agreement "delay[ed] CFIUS approval in breach of the Merger Agreement"); *Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *12 (Del. Ch. Sept. 19, 2022) ("If GT's performance was conditioned upon KPMG issuing a formal valuation, GT was obliged not to interfere with the exercise of KPMG's discretion in reaching that valuation[.]").

[126] *See* Master Project Agreement §§ 9.2 ("The MFF shall be determined as follows, irrespective of the amount of Products produced by the Expansion Assets . . . ."); *see id.* §§ 9.3(A), 9.5 (providing that the MOF and MFF payments shall commence "on the Plant A Commencement Date").

The Master Project Agreement excused MFF payments in two scenarios: (1) upon the occurrence of a "MFF Deferral Event" which, by definition, must "occur[] after the completion of the 2024 Plant A Expansion Shutdown"; and (2) upon a "Material Breach" by Air Products, followed by its failure to cure the breach within sixty days of receiving a default notice.  Master Project Agreement §§ 1.1, 18.1(A)(iii).  Neither scenario applied to World Energy.  The first did not apply because the 2024 Plant A Expansion Shutdown had not yet been completed.  The second did not apply because World Energy did not provide Air Products notice or an opportunity to cure any purported breaches, as required by Section 18.1(A)(iii).

parties intended for World Energy to owe payments only after Plant A's expansion work was complete or only after the work yielded a certain level of cash flow, they could have said so in the contract.[127] They did not. They agreed to monthly payments untethered to performance or profit. And World Energy defaulted the very first month any such payment was owed.[128]

From there, World Energy argues Air Products breached its obligation to assist with working capital financing.[129] That contention is not supported by the Complaint or the record. World Energy does not plead or identify a single instance after the forbearance period where it "requested," but failed to receive, Air Products' assistance in securing capital.[130]

---

[127] World Energy alleges the parties had discussed and understood "that World Energy's payment obligations would only kick in after Air Products completed the Plant A optimization work, thereby creating the value and additional cash flow necessary for World Energy to make interest payments." Compl. ¶ 130; *see also id.* ¶¶ 9, 95. That is not what the contract says. *See* Master Project Agreement §§ 9.2, 9.3, 9.5. "It is well-established that '[if] a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.'" *ITG Brands, LLC v. Reynolds Am., Inc.*, 2019 WL 4593495, at *12 (Del. Ch. Sept. 23, 2019) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[128] Forbearance Agreement §§ 1.01(b)(i)–(ii).

[129] D.I. 27 at 11.

[130] Master Project Agreement § 32.15 (Air Products shall use commercially reasonable efforts to cooperate with World Energy, as reasonably requested by World Energy, in order to assist World Energy to secure working capital finance, subject to the limitations and restrictions set forth in the New Credit Facility and this Agreement.").

World Energy's next argument to avoid the consequences of its breaches relates to the contractual mechanics of termination. Section 8.2(B) of the Master Project Agreement provides that "except with respect to payments that are the subject of good faith disputes[,]" Air Products was entitled to suspend performance if a default remained unremedied for fifteen days after the payment due date, subject to forty-five days' written notice.[131] Air Products sent five written "Notice[s] of Potential Air Products Suspension" for every missed MFF payment between October 2024 and February 2025.[132] Each of those missed payments, and failure to cure within ninety days, put World Energy in "Material Breach."[133] Under Section 18.1(B)(i), Air Products was then entitled to "immediately terminate" the Master Project Agreement upon providing a termination notice.[134] It did so on February 24, 2025.[135]

World Energy presses that none of the missed MFF payments triggered a termination right because they were never "due" in the first place: World Energy contends they were "the subject of a good faith dispute."[136] Not so. The contract

---

[131] *Id.* § 8.2(B).

[132] *See* Carbonara Aff. Exs. G, H, J, L, N.

[133] Master Project Agreement § 18.1(A)(i).

[134] *Id.* § 18.1(B)(i).

[135] Carbonara Aff. Ex. V.

[136] *See* Carbonara Aff. Ex. X at 3.

25

permits World Energy to challenge only "proposed adjustments and calculations," and not "the obligation to pay the MFF" itself.[137] To raise that challenge, it must offer "supporting documentation with respect to the amount disputed."[138] And it must pay any "non-disputed" amounts on time, pending resolution of the purported dispute.[139] World Energy did not follow those procedures before termination. World Energy did not make any cognizable challenge as to "proposed adjustments and calculations," backed up by supporting documentation, and certainly did not identify and pay any undisputed amount.[140] A bare assertion at this point that the payments "[we]re not 'due'" because of "a good faith dispute" does no work for World Energy.[141] Air Products was entitled to suspend performance and terminate the Master Project Agreement.[142]

Air Products' performance under the Master Project Agreement was unambiguously conditioned on receiving monthly payments from World Energy.[143]

---

[137] Master Project Agreement § 8.2(A).

[138] *Id.*

[139] *Id.* ("World Energy will pay the non-disputed invoice by the original due date . . . and may withhold payment of the disputed invoice amount pending resolution.").

[140] *Id.*

[141] Carbonara Aff. Ex. X at 3. World Energy is correct that under Section 8.2(A), it was entitled to dispute an invoice "within the period of one year of the date of the invoice." Master Project Agreement § 8.2(A).

[142] *See* Master Project Agreement §§ 8.2(B), 18.1(B)(i).

[143] *Id.* § 8.2(B).

World Energy failed to make those payments. And it failed to plead any circumstances excusing its defaults. Counts I and II are dismissed.

It follows that Count VI, which seeks a declaration that World Energy has not breached any of the relevant agreements and is entitled to have Air Products' termination withdrawn, fails as well. Count VI is dismissed.

## 2. Breach Of The Implied Covenant

Count III asserts a claim for breach of the implied covenant of good faith and fair dealing. The implied covenant "inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party . . . from receiving the fruits of the bargain.[144] "To state a claim for breach of the implied covenant, [a plaintiff] 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'"[145] "General allegations of bad faith conduct are not sufficient."[146]

---

[144] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (internal quotation marks omitted) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)); *see also Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." (citation omitted)).

[145] *Wiggs v. Summit Midstream P'rs, LLC*, 2013 WL 1286180, at *9 (Del. Ch. Mar. 28, 2013) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[146] *Kuroda*, 971 A.2d at 888.

The implied covenant's "gap-filling power is a limited and extraordinary remedy," and wielding it is a "cautious enterprise."[147]  It "cannot be invoked to override express provisions of a contract"[148] or "contradict[] a clear exercise of an express contractual right."[149]  It cannot be used to "create a free-floating duty unattached to the underlying legal documents."[150]  As such, a party invoking the implied covenant must plead a "gap" in the relevant agreement.[151]  That gap must reflect "developments that could not be anticipated, not developments that the parties simply failed to consider" at the time of contracting.[152]  There is no gap to fill "when the contract addresses the conduct at issue."[153]

---

[147] *Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 254 (Del. 2026) (internal quotation marks omitted) (citing *Nemec*, 991 A.2d at 1125, 1128, and then *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019)).

[148] *Kuroda*, 971 A.2d at 888.

[149] *Nemec*, 991 A.2d at 1127.

[150] *Dunlap*, 878 A.2d 434, 441 (Del. 2005) (alterations, footnote, and internal quotation marks omitted) (compiling sources and quoting *Glenfed Fin. Corp., Com. Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)).

[151] *See Johnson & Johnson*, 352 A.3d at 256 ("The covenant applies only where there is a genuine contractual gap about a truly unanticipated development . . . ." (citations omitted)); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014) ("When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled." (citation omitted)).

[152] *Nemec*, 991 A.2d at 1126 (citing *Dunlap*, 878 A.2d at 441).

[153] *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 896 (Del. 2015) (citing *Dunlap*, 878 A.2d at 441).

World Energy claims Air Products frustrated the parties' bargain by exiting the Paramount Facility expansion project "for commercial reasons unrelated to World Energy's performance" and manufacturing "pretextual grounds to terminate."[154] But the Master Project Agreement tells the parties exactly when and how they could terminate: upon a material breach by the other party, with no limitations.[155] World Energy's uncured defaults triggered Air Products' right to walk away from the relationship, no matter its true motive. "The time to demand restrictions on an express contractual right was during negotiations—not years later through the implied covenant," after that right was validly triggered.[156] Draping the contractual consequences of World Energy's nonpayment in "general allegations of bad faith" does not invoke the implied covenant.[157] World Energy fails to state a claim for its breach. Count III is dismissed.

### 3. Estoppel

In Count VII, World Energy asserts a single claim for both promissory and equitable estoppel.[158] It alleges that after terminating the Master Project Agreement,

---

[154] D.I. 27 at 37; *see also* Compl. ¶¶ 17, 24, 237–40.

[155] Master Project Agreement § 18.1.

[156] *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021) (citing *Nemec*, 991 A.2d at 1126).

[157] *Kuroda*, 971 A.2d at 888.

[158] Compl. ¶¶ 262–69.

Air Products promised—and began preparing—to complete "necessary repairs to the 12-D Rack," including by "preparing the site and removing bracing and scaffolding."[159]

"[P]romissory estoppel is fundamentally a narrow doctrine, designed to protect the legitimate expectations of parties rendered vulnerable by the very processing of attempting to form commercial relationships."[160] To plead a promissory estoppel claim, the plaintiff must allege that:

> (1) a promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (3) the promisee reasonably relied on the promise and took action to his detriment; and (4) such promise is binding because injustice can be avoided only be enforcement of the promise.[161]

At oral argument, World Energy explained that the 12-D Rack repairs are "part and parcel" of Air Products' "obligations to fund and complete the work and to maintain the plant under the [Master Project Agreement]."[162] But as our Supreme Court noted in *SIGA Technologies, Inc. v. PharmAthene, Inc.*, promissory estoppel is inapplicable "where a fully integrated, enforceable contract governs the promise

[159] *Id.* ¶¶ 263, 264.

[160] *Ramone v. Lang*, 2006 WL 905347, at *14 (Del. Ch. Apr. 3, 2006).

[161] *Grunstein v. Silva*, 2009 WL 4698541, at *7 (Del. Ch. Dec. 8, 2009) (citing *Pharmathene, Inc. v. SIGA Techs., Inc.*, 2008 WL 151855, at *17 (Del. Ch. Jan. 16, 2008), and then citing *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000))).

[162] Hr'g Tr. 11–12.

at issue."[163]  World Energy cannot rely on promissory estoppel to revive a promise that was covered by, and thus died with, the Master Project Agreement.[164]

The question is therefore whether World Energy has pled Air Products made a cognizable promise about the 12-D Rack after it terminated the Master Project Agreement.  Promissory estoppel requires "a real promise, not just mere expressions of expectation, opinion, or assumption."[165]  The promise must be "reasonably definite and certain."[166]  World Energy has fallen short of pleading a definite promise.

World Energy alleges that after Air Products terminated the Master Project Agreement, "[b]oth parties planned and agreed that Air Products would permanently repair the 12-D Rack during [a] February 2025 turnaround."[167]  It further alleges Air completed "pre-work" for the repairs, and that "[t]hroughout [] daily communications, Air Products consistently communicated that they were moving forward with the 12-D Rack and other repairs."[168]  Those allegations do not amount

---

[163] 67 A.3d 330, 348 (Del. 2013) (citing *Chrysler Corp. (Del.) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1033–34 (Del. 2003)).

[164] *See* Master Project Agreement §§ 2.1, 32.6.

[165] *James Cable, LLC v. Millennium Digit. Media Sys., L.L.C.*, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009) (internal quotation marks omitted) (quoting *Addy v. Piedmonte*, 2009 WL 707641, at *22 (Del. Ch. Mar. 18, 2009)).

[166] *Id.* (citing *Cont'l Ins. Co. v. Rutledge & Co. Inc.*, 750 A.2d 1219, 1233 (Del. Ch. 2000)).

[167] Compl. ¶ 181.

[168] *Id.* ¶¶ 185, 186.

to a real promise. "[D]aily conversations" between onsite teams about "moving forward" with certain repairs cannot be reasonably interpreted as a definite promise.[169] World Energy does not plead "when the promise was made, to whom it was made, or any other specifics."[170] It does not indicate Air Products would complete the 12-D Rack repairs on "any particular terms."[171] World Energy's failure to plead a real promise is fatal to its promissory estoppel claim.[172]

World Energy's equitable estoppel theory fares no better. To state a claim for equitable estoppel, a plaintiff must allege:

> (1) conduct by the party to be estopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, and inconsistent with that which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth, (3) the intention or expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other, and (4) action or forbearance by the other party amounting to a change of status to his detriment.[173]

---

[169] *Id.* ¶ 185.

[170] *James Cable*, 2009 WL 1638634, at *5.

[171] *Hyetts Corner, LLC v. New Castle Cnty.*, 2021 WL 4166703, at *9 (Del. Ch. Sept. 14, 2021).

[172] *See Metro. Convoy Corp. v. Chrysler Corp.*, 208 A.2d 519, 521 (Del. 1965).

[173] *Olson v. Halvorsen*, 2009 WL 1317148, at *11 (Del. Ch. May 13, 2009) (internal quotation marks omitted) (quoting *Cornerstone Brands, Inc. v. O'Steen*, 2006 WL 2788414, at *3 n.12 (Del. Ch. Sept. 20, 2006)), *aff'd*, 986 A.2d 1150 (Del. 2009).

A party's "reliance must be both reasonable and justified under the circumstances. Thus, the standards for establishing the elements of equitable estoppel are stringent; the doctrine is applied cautiously and only to prevent manifest injustice."[174]

World Energy has not pled circumstances that support justifiable reliance on any purported representations about the 12-D Rack repairs. When the 2025 February turnaround allegedly began, World Energy was well aware of Air Products's exit from the Paramount Facility project. It knew Air Products suspended performance in early February, sent a formal termination notice later that month, and publicly announced the termination.[175] The termination notice referenced the impending "demobilization and winding-down" of Air Products' work, and explained Air Products was walking away because it was not getting paid.[176] Even if World Energy questioned the termination's validity, it could not have reasonably relied on informal onsite communications and "pre-work" on a job Air Products had just called off.[177] Count VII is dismissed.

---

[174] *Pilot Point Owners Ass'n v. Bonk*, 2008 WL 401127, at *2 (Del. Ch. Feb. 13, 2008) (footnote omitted) (citing *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *6 (Del. Ch. July 9, 2002)).

[175] Compl. ¶¶ 170–74.

[176] Carbonara Aff. Ex. V at 1.

[177] Compl. ¶ 186.

## 4. Mutual Mistake And Reformation

Count IV asserts a mistake claim seeking reformation of the Credit Agreement.[178]  Specifically, it seeks a reformation that would swap the Credit Agreement's unambiguous 15% interest rate[179] with a 4.5% rate used in the Master

---

[178] *See* Compl. ¶¶ 241–49.

The parties dispute whether I need to address this claim at all.  In the fall of 2025, a New York court found World Energy liable for breach of the Guaranty and awarded Air Products damages in the amount of $343,014,718.45, representing what World Energy owed under the Credit Agreement.  *Air Prods. & Chems., Inc.*, 2025 WL 2682969, at *1. The judgment was unanimously affirmed on appeal.  *Air Prods. & Chems., Inc.*, 256 N.Y.S.3d at 17.  Air Products argues these decisions are dispositive of World Energy's reformation claim.  *See* D.I. 40.

But as World Energy observes, the New York action "involved only a single claim relating to a single contract: [Air Products'] claim against [WE LLC] to enforce payment obligations under the parties' Guaranty."  D.I. 41 at 2.  While the trial court concluded the applicable interest rate on those payment obligations was 15%, it did not address the narrow issue of whether World Energy is entitled to the equitable remedy of reformation on mutual mistake grounds.  So I have considered that claim.

The Credit Agreement contains a New York choice of law provision.  *See* Credit Agreement § 10.9.  "Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."  *J.S. Alberici Constr. Co., Inc. v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000) (citing *Annan v. Wilm. Tr. Co.*, 559 A.2d 1289, 1293 (Del. 1989)). But in litigating this claim, the parties have relied solely on Delaware law.  *See* D.I. 24 at 50–53; D.I. 27 at 38–41; D.I. 29 at 28–32.

It does not appear the choice of law would change the analysis or outcome.  In both Delaware and New York, to state a reformation claim based on mutual mistake, the proponent must plead with particularity "exactly what was really agreed upon between the parties."  *11 King Ctr. Corp. v. City of Middletown*, 982 N.Y.S.2d 504, 505–06 (N.Y. App. Div. 2014) (internal quotations omitted) (quoting *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc.*, 413 N.Y.S.2d 135, 139 (N.Y. Ct. App. 1978)); *see also Hilgreen v. Pollard Excavating, Inc.*, 146 N.Y.S.3d 323, 325–26 (N.Y. App. Div. 2021); *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1152–53 (Del. 2002).  I take the parties' lead and evaluate World Energy's claim under Delaware law.

[179] *See* Credit Agreement § 1.1 (defining "Applicable Rate" as "15.0% per annum").

Project Agreement in connection with the MFF.[180] It alleges the failure to reflect a 4.5% interest rate in the Credit Agreement was an "obvious error."[181]

Reformation is a narrow equitable remedy. It is "not an equitable license for the Court to write a new contract at the invitation of a party who is unsatisfied with his or her side of the bargain; rather, it permits the Court to reform a written contract that was intended to memorialize, but fails to comport with, the parties' prior agreement."[182] "The Court may reform a contract 'only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional circumstances, a unilateral mistake coupled with the other parties' knowing silence.'"[183]

World Energy advances a mutual mistake theory. That theory imposes a heavy burden. A plaintiff alleging mutual mistake "must show that both parties were mistaken as to a material portion of the written agreement."[184] To survive a motion to dismiss, the plaintiff must allege: (1) the parties reached a definite agreement

---

[180] Compl. ¶¶ 245–46, 249.

[181] *Id.* ¶ 248.

[182] *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *13 (Del. Ch. Oct. 20, 2015); *see also Collins v. Burke*, 418 A.2d 999, 1002–03 (Del. 1980); *In re Est. of Justison*, 2005 WL 217035, at *10 (Del. Ch. Jan. 21, 2005).

[183] *Great-W. Inv'rs LP v. Thomas H. Lee P'rs, L.P.*, 2011 WL 284992, at *11 (Del. Ch. Jan. 14, 2011) (quoting *James River-Pennington Inc. v. CRSS Cap., Inc.*, 1995 WL 106554, at *7 (Del. Ch. Mar. 6, 1995)).

[184] *Cerberus Int'l*, 794 A.2d at 1151–52 (citing *Collins*, 418 A.2d at 1002).

before executing the final contract; (2) the final contract failed to incorporate the terms of the agreement; (3) the parties' mutually mistaken belief reflected the parties' true agreement; and (4) the precise mistake the parties made.[185] "The requirements are cumulative, and each one must be pled with particularity."[186]

The claim fails at the first step: pleading a definite prior agreement. "Reformation requires the existence of a specific prior contractual understanding that conflicts with the terms of the written agreement."[187] While that prior understanding "need not constitute a complete contract in and of itself,"[188] it must be sufficiently definite to specify for the Court "exactly what terms to insert in the contract."[189] World Energy alludes to an oral agreement between the parties about charging a 4.5% interest rate on the Credit Agreement loan until Air Products completed its Plant A optimization work.[190] As pled, that agreement is far from definite.

---

[185] *Great-W. Inv'rs LP*, 2011 WL 284992, at *11 (citing *Joyce v. RCN Corp.,* 2003 WL 21517864, at *4 (Del. Ch. July 1, 2003)).

[186] *AECOM v. SCCI Nat'l Hldgs., Inc.*, 2023 WL 6294985, at *6 (Del. Ch. Sept. 27, 2023) (citing *Cerberus Int'l*, 794 A.2d at 1153); *see* Ct. Ch. R. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

[187] *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *13 (Del. Ch. May 16, 2012).

[188] *Cerberus Int'l*, 794 A.2d at 1152 (citations omitted).

[189] *Collins*, 418 A.2d at 1002 (citations omitted).

[190] Compl. ¶ 121.

First, World Energy relies on the loan's structuring history. It argues the Credit Agreement's $270 million loan arose out of a $300 million loan bifurcated into two components for tax reasons: a $30 million sale-leaseback under the Master Project Agreement and a $270 million loan under the Credit Agreement.[191] The $30 million sale-leaseback applied a 4.5% "rate of return."[192] World Energy thus contends the parties "obvious[ly]" intended to apply that 4.5% rate across both agreements.[193] That argument is unpersuasive. The structuring history explains why the parties divided World Energy's financing obligations into two instruments. It does not "demonstrate[e] that the parties came to a 'real agreement'" on charging the same interest rate under both instruments.[194]

From there, World Energy points to statements by Air Products executives after the parties executed the Credit Agreement.[195] When World Energy allegedly broached the interest rate issue to Air Products, one executive explained the 15% interest rate "may be a mistake."[196] Another explained that rate "did not sound

---

[191] *Id.* ¶¶ 95–96.

[192] *Id.* ¶ 103a; Master Project Agreement at Attachment B.

[193] Compl. ¶ 248.

[194] *MetCap Securities LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *9 (Del. Ch. May 16, 2007).

[195] *See Davis v. C.J. Harris, Inc.*, 1962 WL 69607, at *3 (Del. Ch. Oct. 10, 1962) ("Subsequent events or representations are of no consequence in determining whether or not a mutual mistake existed when the contract was executed." (citation omitted)).

[196] Compl. ¶ 123a.

right."[197] Still another suggested "World Energy should hold off on making interest payments" at all until the Paramount Facility achieved sufficient production levels.[198] These statements are not only vague, but also inconsistent. They offer no "definitive, clear and particular agreement" about a 4.5% interest rate for the Court to reference in reforming the Credit Agreement.[199]

And World Energy itself agreed the 15% interest rate was not a mistake. In the Forbearance Agreement, executed eight months after the Credit Agreement, World Energy unconditionally acknowledged the Credit Agreement "is legal, valid, binding, and enforceable . . . in accordance with its terms."[200] And it acknowledged that under those terms, it owed no less than $18,460,000 in overdue interest payments.[201] Those acknowledgements undermine any theory of mistake here. Count IV is dismissed.

### 5. Fraud

Count V asserts a claim for fraud, alleging Air Products promised "a reasonable cure or forbearance agreement" if World Energy executed the Second

---

[197] *Id.* ¶ 123b.

[198] *Id.* ¶ 126; *see also id.* ¶ 127 (alleging that "[f]ollowing the February 2024 meeting, both parties understood and agreed that World Energy would not pay interest until the Plant A expansion work was completed and until a third-party working capital provider was installed").

[199] *AECOM*, 2023 WL 6294985, at *8.

[200] Forbearance Agreement § 1.02(a).

[201] *Id.* § 1.02(b)(ii).

Amendment to the Credit Agreement.[202]  To survive a motion to dismiss on a claim

for fraud, a plaintiff must plead:

> (1) a false representation, usually one of fact; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[203]

Under Court of Chancery Rule 9(b), "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake."[204]  To

satisfy Rule 9(b), a plaintiff must allege: "(1) the time, place, and contents of the

false representation; (2) the identity of the person making the representation; and (3)

what the person intended to gain by making the representations."[205]

World Energy's fraud claim is not premised on false representations of fact.

Instead, it is premised on an allegedly false promise—i.e., to "enter into a separate

cure or forbearance agreement" if World Energy agreed to execute the Second

---

[202] Compl. ¶ 253.

[203] *See Hauspie v. Stonington P'rs, Inc.*, 945 A.2d 584, 586 (Del. 2008).

[204] Ct. Ch. R. 9(b).

[205] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d at 1050 (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)).

Amendment.[206] World Energy's fraud allegations "are thus best considered through the lens of 'promissory fraud.'"[207]

"This Court looks with particular disfavor at allegations of fraud when the underlying utterances take the form of unfulfilled promises of future performance."[208] That is because usually, "statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud."[209] A claim of promissory fraud thus entails "a heightened burden to plead 'particularized facts that allow the Court to infer that, at the time the promise was made, the speaker had no intention of keeping it.'"[210] That is, the plaintiff "must plead specific facts that lead to a reasonable inference that the promissor had no intention of performing at the time the promise was made."[211] "[A] party's failure to keep a promise does not prove the promise was false when made."[212]

---

[206] Compl. ¶ 251.

[207] *CPC Mikawaya Hldgs., LLC v. MyMo Intermediate, Inc.*, 2022 WL 2348080, at *17 (Del. Ch. June 29, 2022).

[208] *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *9 (Del. Ch. Dec. 23, 2008).

[209] *Outdoor Techs., Inc. v. Allfirst Fin., Inc.,* 2001 WL 541472, at *4 (Del. Super. Apr. 12, 2001) (citations omitted).

[210] *CPC Mikawaya Hldgs.*, 2022 WL 2348080, at *17 (quoting *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010)).

[211] *Winner Acceptance,* 2008 WL 5352063, at *10.

[212] *Berdel, Inc. v. Berman Real Est. Mgmt., Inc.*, 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997).

World Energy's promissory fraud allegations lack "a proper pleading of intent."[213] It does not plead particularized facts suggesting Air Products "intended to renege at the time it made the promise."[214] It pleads only that Air Products promised an updated forbearance agreement if World Energy executed the Second Amendment, and that Air Products subsequently refused to honor that promise.[215] While World Energy quibbles with the "suspicious timing" of the refusal,[216] the Complaint itself pleads Air Products did not exercise its remedies until months after the Second Amendment.[217] World Energy offers no basis to infer from that chronology that Air Products intended to renege at the time of its promise.

With no other specific facts to rely on, World Energy falls back on its argument that Air Products simply "had no intention of providing World Energy relief, as evidenced by its immediate refusal to honor the promise once the Second Amendment was signed."[218] Again, "a party's failure to keep a promise" is not "evidence" of an intent to break that promise at the outset.[219] World Energy has failed to state a claim for promissory fraud. Count V is dismissed.

---

[213] *Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at *9 (Del. Ch. Aug. 30, 2019).

[214] *Berdel*, 1997 WL 793088, at *8 (citations omitted).

[215] *See* Compl. ¶¶ 156, 251–54.

[216] D.I. 27 at 46 (citing *Grunstein*, 2009 WL 4698541, at *13).

[217] *See* Compl. ¶ 173.

[218] *Id.* ¶ 254.

[219] *See Berdel*, 1997 WL 793088, at *8.

## B. Irreparable Harm and Balance of the Equities

At oral argument, I told the parties there were several reasons I would not order the mandatory injunction World Energy requested. This case must be dismissed for failure to state a claim; further ruminations on why final relief is not granted stray into dicta. But for the sake of explaining my reasoning for denying the preliminary injunction when I did, I will note that World Energy also failed to demonstrate the sine qua non of injunctive relief: irreparable harm.

"A mandatory injunction will only issue if the plaintiff demonstrates it is necessary to prevent irreparable harm."[220] While not dispositive, the availability of a remedy at law in the form of compensatory damages tips against a finding of irreparable harm.[221]

World Energy sees irreparable harm from the 12-D Rack's current condition in the potential loss of customer relationships, the potential loss of its "first-mover and industry-leader status" in the sustainable aviation fuel market, and damage to both the Paramount Facility and the city's economy.[222] But by World Energy's own

---

[220] *DeMarco v. Christiana Care Health Servs., Inc.*, 263 A.3d 423, 437 (Del. Ch. 2021) (citing *Richard Paul, Inc. v. Union Improvement Co.*, 86 A.2d 744, 747–48 (Del. Ch. 1952)).

[221] *See AM Gen. Hldgs. LLC v. Renco Gp., Inc*., 2012 WL 6681994, at *4 (Del. Ch. Dec. 21, 2012); *Gray v. Council of Town of Newark*, 79 A. 735, 737 (Del. Ch. 1911) ("A clear case of prospective injury for which the plaintiff will have no adequate remedy at law is indispensable.").

[222] Compl. ¶¶ 216–17.

admission, it does not need the requested mandatory relief to avoid those harms: World Energy could "engage another entity" to make the 12-D Rack repairs and complete the work.[223] Indeed, according to World Energy, "the 12-D Rack is not a complex piece of machinery" that only Air Products can repair.[224]

Oral argument injected some question as to whether World Energy can hire somebody else to repair the 12-D Rack and seek to shift the costs to Air Products. There, World Energy asserted that engaging another entity would be infeasible given Air Products' ownership of the land, structures, and equipment at issue.[225] It argued Air Products has cut off access to the Paramount Facility.[226] Counsel for Air Products represented that is not true, referencing a letter it sent World Energy on July 8, 2025.[227] That letter makes clear "the access offer remains open."[228] I cannot conclude World Energy will suffer irreparable harm absent the requested relief.

---

[223] *Id.* at Prayer for Relief.

[224] D.I. 27 at 27.

[225] Hr'g Tr. 55; *see also* D.I. 27 at 23; Compl. ¶ 192.

[226] Hr'g Tr. 55.

[227] *Id.* at 124–25 (referencing a letter dated July 8, 2025, stating that "the access offer remains open. If World Energy wishes to access the Paramount refinery to conduct remediation activities, it is welcome to do so with appropriate supervision as long as it pays for those activities and confirms that allowing access will not prejudice Air Products' legal rights . . . ."). World Energy did not dispute receiving this letter.

[228] *Id.*

In the absence of irreparable harm, the balance of the equities weighs against World Energy. Granting the requested mandatory relief would require Air Products to perform services under a contract that it terminated months ago, as it was entitled to do. World Energy can solve the problem its defaults created by hiring somebody else to fix the 12-D Rack. Under these circumstances, World Energy has not shown that denying the mandatory injunction would cause it "greater harm than granting the injunction will cause [Air Products]."[229]

## III. CONCLUSION

World Energy is not entitled to the mandatory injunctive relief it seeks, and Air Products' motion to dismiss is **GRANTED**.

---

[229] *DeMarco*, 263 A.3d at 437 (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 587 (Del. Ch. 1998)).